IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| EMIL MAMATKASYM UULU, <br><br> Petitioner, <br><br> vs. <br><br> MARKWAYNE MULLINS, in their official capacity as Secretary of the United States Department of Homeland Security; TODD BLANCHE, in their official capacity as Acting Attorney General of the United States; TODD M. LYONS, in their official capacity as Acting Director of the United States Immigration and Customs Enforcement; DAVID EASTERWOOD, in their official capacity as St. Paul Acting Field Office Director for Enforcement and Removal Operations, United States Immigration and Customs Enforcement; and CAROLYN SOMMER, in their official capacity as Acting Warden of McCook Detention Center, <br><br> Respondents. | 4:26CV3142 <br><br><br> **MEMORANDUM AND ORDER ON PETITION FOR WRIT OF HABEAS CORPUS** |

In this action for habeas corpus relief pursuant to 28 U.S.C. § 2241, Petitioner Emil Mamatkasym Uulu, a citizen of Russia and native of Kyrgyzstan who was paroled into the United States on September 12, 2022, challenges his detention by respondents since November 2025, currently at the McCook Detention Center in McCook, Nebraska. Filing 1 at 1–2 (¶¶ 1–2). For the reasons stated below, Uulu's Petition for Writ of Habeas Corpus is denied.

## I.   INTRODUCTION

The Court begins with a summary of the procedural background rather than a summary of the factual background because the Court finds that the procedural background brings the key issues—which are legal—most sharply into focus.

1

### A.  Procedural Background

#### 1.  The Petition

Uulu asserts that the critical distinction between his and other § 2241 cases is that he was detained after being paroled into the United States rather than found in the United States after illegal entry. Filing 1 at 2–3 (¶ 4). Unlike various petitions for writs of habeas corpus pursuant to 28 U.S.C. § 2241 filed by aliens in this and other districts around the country, Uulu asserts that "[t]his case is not about which detention statute applies"—that is, whether either 8 U.S.C. § 1225(b)(2) or 8 U.S.C. § 1226(a) applies. Filing 1 at 2 (¶ 3). He alleges that this case is instead "about whether the government may strip a person of liberty it previously granted—after more than three years of compliance—without notice, without a hearing, without any finding of changed circumstances, and without any individualized determination that detention is necessary," which he asserts is contrary to the Due Process Clause of the Fifth Amendment to the United States Constitution. Filing 1 at 2 (¶ 3).

Despite Uulu's assertion that the case is not about what detention statute applies, Count I of Uulu's Petition, filed on May 5, 2026, is entitled "Violation of the Immigration and Nationality Act [–] Detention Under the Wrong Statute," and in it, Uulu asserts that he is detained under 8 U.S.C. § 1226(a) rather than 8 U.S.C. § 1225(b)(2). Filing 1 at 12–13 (¶¶ 40–41). Uulu alleges that neither the Fifth Circuit's decision in *Buenrostro-Mendez v. Bondi*, 166 F.4th 494 (5th Cir. 2026), nor the Eighth Circuit's decision in *Avila v. Bondi*, 170 F.4th 1128 (8th Cir. 2026), addressed detention of an alien like him who entered at a port of entry, was inspected, and was paroled into the United States. Filing 1 at 1 (¶ 42).

Count II of Uulu's Petition is entitled "Violation of the Fifth Amendment Due Process Clause [–] Detention After Prolonged Community Release Without Process." Filing 1 at 13. In this Count, Uulu alleges that respondents are violating his due process rights by detaining him with

(a) "no written notice of the reasons for detention"; (b) "no hearing before a neutral decisionmaker"; (c) "no individualized assessment of flight risk or danger"; and (d) "no finding of changed circumstances justifying detention after years of community release." Filing 1 at 14 (¶ 47). Uulu asserts that application of the three-factor test from *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976), demonstrates the constitutional violation. Filing 1 at 14–15 (¶¶ 48–52). In addition, or in the alternative, he alleges that the Court should use the approach in *Sandhu v. Mullin*, No. 7:26-CV-5009, 2026 WL 1146643 (D. Neb. Apr. 28, 2026), to determine that his detention was not accompanied by constitutionally sufficient procedures. Filing 1 at 15–18 (¶¶ 53–65).

Count III of Uulu's Petition asserts a claim entitled "Violation of the Fifth Amendment Due Process Clause [–] Indefinite Detention Without Reasonably Foreseeable Removal." Filing 1 at 19. It asserts that Uulu's removal to Kyrgyzstan, as ordered by an Immigration Judge (IJ), is not reasonably foreseeable, so that his indefinite detention violates the constitutional standard set out in *Zadvydas v. Davis*, 533 U.S. 678 (2001). Filing 1 at 19 (¶ 67). He alleges that there is no evidence that Kyrgyzstan has agreed to accept him or that the discretionary citizenship restoration process to restore his former Kyrgyz citizenship—which he had renounced to become a Russian citizen—has been initiated. Filing 1 at 19 (¶ 68).

As relief, Uulu asks the Court to do the following:

1) Assume jurisdiction over this matter;

2) Order the immediate release of Petitioner pending these proceedings;

3) Order Respondents not to transfer Petitioner out of the District of Nebraska during the pendency of these proceedings to preserve jurisdiction and access to counsel;

4)      Declare Respondent's detention of Petitioner violates the Due Process Clause of the Fifth Amendment and the Immigration and Nationality Act;

5)      Issue a Writ of Habeas Corpus pursuant to 28 U.S.C § 2241 and order Respondents to immediately release Petitioner, or in the alternative, order Respondents provide Petitioner with a bond hearing consistent with 8 U.S.C. § 1226(a);

6)      In the alternative, order Respondents to show cause why this Petition should be granted within three days;

7)      Award reasonable attorneys' fees and costs pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412; and,

8)      Grant such further relief as the Court deems just and proper.

Filing 1 at 19–20 (Prayer).

*2. The Habeas Proceedings*

On May 8, 2026, the Court entered an Order to Show Cause that *inter alia* set a deadline for respondents to make a return not later than three business days after service of Uulu's Petition with a copy of the Order to Show Cause and a deadline of three business days after the filing of respondents' return for Uulu to file any reply. Filing 6 at 4. The Court also indicated that, upon the filing of respondents' return and Uulu's reply, the Court would promptly set a hearing on this matter. Filing 6 at 4. Notwithstanding that no proof of service on any respondent had yet been filed, the Federal Respondents filed their return on May 12, 2026. Filing 7. Uulu then filed a reply on May 15, 2026. Filing 10.

On May 18, 2026, after noting that there was still no proof of service on the State Respondent, the Acting Warden of the McCook Detention Center—or any respondent, for that matter—the Court ordered Uulu to serve and file proof of service of his Petition and the Show Cause Order on the State Respondent, as Uulu's physical custodian, before the Court would proceed further with this matter to ensure that the Court has subject-matter jurisdiction. Filing 11

4

(citing *Rumsfeld v. Padilla*, 542 U.S. 426, 434–35, 442 (2004)). Uulu filed proof of service on all respondents later that same day. Filing 12. Counsel appeared on behalf of the State Respondent and filed the State Respondent's return on May 20, 2026, stating that the State Respondent takes no position on the substantive issues raised in the Petition or on whether a writ should or should not be granted. Filing 13; Filing 14 at 2. Thus, the Court may proceed with the case.

After reviewing the parties' written submissions, the Court concludes that an evidentiary hearing is not required because a conclusion can be reached on the legal issues presented based on the undisputed facts. *See Ruiz v. Norris*, 71 F.3d 1404, 1406–07 (8th Cir. 1995) (explaining that "an evidentiary hearing [in a habeas case] is unnecessary and not required in cases 'where the petitioner's allegations, even if true, fail to state a claim upon which habeas relief can be granted'" (quoting *Amos v. State*, 849 F.2d 1070, 1072 (8th Cir. 1988))).

### B.  Factual Background

The factual background here is drawn primarily from Uulu's Petition and attached documents. It is then supplemented where appropriate from the documents attached to the Federal Respondents' return.

### 1.  *Uulu's Entry and Parole into the United States*

Uulu is a citizen of Russia and a native of Kyrgyzstan. Filing 1 at 4 (¶ 11).[1] He entered the United States at the San Ysidro Port of Entry on September 12, 2022. Filing 1 at 1 (¶ 1), 8 (¶ 26). He was paroled into the United States on that date. Filing 1 at 1 (¶ 1); Filing 9 at 3 (¶ 12). His I-94

---

[1] The Declaration of Daniel Archer, a Deportation Officer, offered in support of Federal Respondents' Return, asserts the opposite: that Uulu "is a native of Russia and a citizen of Kyrgyzstan." Filing 9 at 3 (¶ 11). This difference does not generate a factual dispute, however, because the record otherwise demonstrates conclusively that Uulu's nationality at birth was Kyrgyz and his present nationality (citizenship) is Russian. Filing 1-7 at 1 (I-589 Application for Asylum); Filing 1-10 at 1 (Immigration Judge's decision on removability and asylum, stating, "The Respondent is a native of Kyrgyzstan and he is a citizen of Russia."). Uulu also submitted his Russian Federation passport. Filing 1-3.

Admission Record shows his "Class of Admission" as "DT" and his "Admit Until Date" as September 11, 2023. Filing 1-1. The parties agree that "DT" means paroled to enter temporarily on humanitarian or public benefit grounds. *See* Filing 1 at 8 (¶ 26) (explaining the "DT" admission); Filing 9 at 3 (¶ 12) (same). After his parole into the United States, Uulu lived in the community in Wheeling, Illinois. Filing 1 at 9 (¶ 27).

  2.  *Uulu's Removal Proceedings*

On October 22, 2022, shortly after Uulu's entry and parole, the Department of Homeland Security (DHS) charged Uulu with removability under 8 U.S.C. § 1182(a)(7)(A)(i)(I) as an immigrant not in possession of a valid entry document. Filing 1 at 9 (¶ 28); Filing 1-5 at 1 (Notice to Appear). Uulu admitted the factual allegations and conceded the charge of removability. Filing 1 at 9 (¶ 28). Uulu then filed an Application for Asylum and for Withholding of Removal, Form I-589, on January 17, 2023. Filing 1 at 9 (¶ 29); Filing 9 at 3–4 (¶ 13) (identifying the date of the I-589 Application).[2] An IJ initially denied that application on June 26, 2023, and found Uulu removable "to RUSSIA, or in the alternative to Kyrgyzstan," when Uulu failed to appear for a hearing. Filing 1 at 9 (¶ 29); Filing 9 at 4 (¶ 14); Filing 1-8 at 1–2 (IJ's decision). However, on August 10, 2023, an IJ granted Uulu's Motion to Reopen under INA § 240(b)(5)(C), 8 U.S.C. § 1229a(b)(5)(C), restoring jurisdiction and scheduled a hearing on Uulu's request for asylum on July 29, 2024. Filing 1 at 9 (¶ 29). The IJ accepted Uulu's representation that he was confused about the hearing date because the notice of the hearing was not in a language that he understands. Filing 1 at 9 (¶ 29); Filing 9 at 4 (¶ 15); Filing 1-9 at 1 (IJ's decision). Uulu was not detained during

---

  [2] Although Uulu cites Filing 1-7 as the I-589 he filed shortly after conceding the charge of removability, that document is the much later I-589 that he filed on July 5, 2024. The copy of his original I-589 filed on January 17, 2023, is not in the record.

any of these proceedings. In fact, on August 17, 2023, Uulu's application for work authorization was approved, and it remains valid until November 6, 2030. Filing 9 at 4 (¶ 16).

On July 5, 2024, Uulu signed and filed another I-589 Application for Asylum and for Withholding of Removal. Filing 1-7; *see also* Filing 1-4 (Uulu's June 21, 2024, Affidavit in Support of I-589 Asylum Application). On December 16, 2024, the IJ entered a written statement of "Oral Decision of the Immigration Judge" on Uulu's I-589 Application. Filing 1-10; Filing 1 at 10 (¶ 30). As to Uulu's citizenship, the IJ stated the following:

> The Respondent testified that he renounced Kyrgyz citizenship. The Respondent has no document or proof of any government official that he no longer has Kyrgyz citizenship, but he did submit an article about the law in Russia. That articles states that he could not have been granted Russian citizenship unless he proved that he had renounced his foreign citizenship to the foreign state's authorities, so preponderance of the evidence standard [sic]. And based on that evidence the Court finds that the Respondent has proven that he was a Kyrgyz citizen and lived in Kyrgyzstan from the date of his birth in 1990 until 2007, but then he went to Russia and renounced his Kyrgyzstan citizenship and became a Russian citizen.

Filing 1-10 at 12; *see also* Filing 1 at 7 (¶ 23). The IJ found "that the Respondent's testimony with regard to being subjected to harassment and discrimination because of his background as a Kyrgyz person and an Asian person is credible" and subsequently found "[t]he Respondent suffered harm rising to the level of persecution within Russia." Filing 1-10 at 12, 16. However, the IJ found that Uulu "is eligible for a simplified procedure for restoring citizenship of the Kyrgyz Republic upon personal application." Filing 1-10 at 18 (citing *Matter of B-R-*, 26 l&N Dec. 119). The IJ concluded further that Uulu was eligible to live and be a full citizen in safety in a location other than Russia—that is, Kyrgyzstan—so the IJ denied the request for asylum. Filing 1-10 at 22.

Ultimately, the IJ's Oral Decision concluded as follows:

> The Court finds that the Respondent is removable pursuant to the charge in the Notice to Appear. The Court finds the Respondent has not proven that he is eligible for asylum. The Court finds that the Respondent is not eligible for Withholding of Removal or protection under the Convention Against Torture with

regard to Kyrgyzstan, but he is eligible for withholding of removal with regard to Russia.

Therefore, the Court will enter and ORDER that the Respondent is to be REMOVED from the United States to Kyrgyzstan and that he is NOT to be REMOVED from the United States to Russia.

Filing 1-10 at 23–24; *see also* Filing 1 at 10 (¶¶ 30–33).

An Order of the Immigration Judge followed on December 28, 2024, summarizing the oral decision entered on December 16, 2025, finding Uulu removable. Filing 1-2 at 1. The Order granted and denied withholding of removal, as specified later in the Order, and denied withholding and deferral of removal under the Convention Against Torture. Filing 1-2 at 1. As to removal, the Order states, "Respondent was ordered removed to Kirghizia (Kyrgyzstan)," "[i]n the alternative, Respondent was ordered removed to Russia," and "was advised of the penalties for failure to depart pursuant to the removal order." Filing 1-2 at 3. Finally, the Order stated that "removal to Russia is withheld," but "removal to Kirghizia (Kyrgystan) is not withheld." Filing 1-2 at 4; *see also* Filing 9 at 4 (¶ 17). Apparently, Uulu was not detained either before or after the IJ entered the Oral Decision and the written Order requiring Uulu's removal to Kyrgystan.

Uulu filed a timely appeal of the IJ's decision to the Board of Immigration Appeals (BIA) on January 15, 2025. Filing 1 at 11 (¶ 34); Filing 9 at 4 (¶ 18). Uulu had not yet received a decision on his appeal at the time that he filed his Petition in this Court. Filing 1 at 11 (¶ 34); Filing 9 at 4 (¶ 18). No party has notified the Court that the BIA has since filed a decision on Uulu's appeal.

3. *Uulu's Detention*

In November 2025, "Respondents took Petitioner into ICE custody," although Uulu's counsel did not know the precise date or circumstances that led to that action. Filing 1 at 11 (¶ 35). The Declaration of Daniel Archer, a Deportation Officer, clarifies the circumstances in which Uulu was taken into custody:

19.    On November 4, 2025, Petitioner was stopped by the Nebraska State Patrol (NSP) for a traffic infraction at a weigh station near Waverly, NE. NSP was unable to communicate with Petitioner in the English language and sought the assistance of ICE. ICE record checks showed Petitioner to have an order of removal and Petitioner was taken into ICE custody.

Filing 9 at 4 (¶ 19). In his Reply, Uulu cites DO Archer's declaration concerning the circumstances in which he was taken into custody, without dispute. Filing 10 at 2–3. Uulu alleges,

Upon information and belief, Petitioner was not provided any notice prior to his detention. He was not afforded a hearing before a neutral decisionmaker. No individualized determination was made that he posed a flight risk or danger to the community. No finding of changed circumstances was made to justify detention after years of community release.

Filing 1 at 11 (¶ 35). Uulu has been detained by ICE since November 2025 and is currently held at the McCook Detention Center in McCook, Nebraska. Filing 1 at 11 (¶ 36).

### 4.   Uulu's Allegations Concerning Foreseeability of Removal

Finally, as to whether his removal is reasonably foreseeable, Uulu alleges the following:

38.    Petitioner's removal from the United States is not reasonably foreseeable. Petitioner cannot be removed to Russia because the IJ granted Withholding of Removal as to Russia. *See* Ex. 2 at 2. Petitioner's removal to Kyrgyzstan—the country designated in his removal order—is uncertain because Petitioner is not a citizen of Kyrgyzstan. He renounced his Kyrgyz citizenship in 2007. There is no assurance that Kyrgyzstan will accept a non-citizen for removal, and Petitioner would first need to apply for and be granted restored citizenship through a process controlled by the Kyrgyz government—a process that is entirely discretionary and has not been initiated by Respondents and Petitioner is unable to do so without Respondent's assistance while detained.

Filing 1 at 12 (¶ 38).

## II.  LEGAL ANALYSIS

### A.  Standards for § 2241 Habeas Relief

Section 2241 of Title 28 of the United States Code extends the writ of habeas corpus *inter alia* to persons "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3). The Supreme Court has recognized that § 2241(c)(3) confers on the

9

District Court jurisdiction to hear habeas corpus challenges to the legality of the detention of aliens, such as Uulu. *Rasul v. Bush*, 542 U.S. 466, 483–84 (2004) ("[Alien] Petitioners contend that they are being held in federal custody in violation of the laws of the United States. . . . Section 2241, by its terms, requires nothing more."), *judgment entered*, No. 04A41, 2004 WL 7372970 (U.S. July 16, 2004); *Zadvydas v. Davis*, 533 U.S. 678, 687 (2001) ("We note at the outset that the primary federal habeas corpus statute, 28 U.S.C. § 2241, confers jurisdiction upon the federal courts to hear these cases." (citing 28 U.S.C. § 2241(c)(3))). The applicable procedures for disposition of a habeas corpus petition under 28 U.S.C. § 2241 are set out in 28 U.S.C. § 2243, which among other things requires a court to "award the writ or issue an order directing the respondent to show cause why the writ should not be granted." 28 U.S.C. § 2243. District Courts in this circuit and elsewhere agree that a habeas petitioner under § 2241 bears the burden of demonstrating by a preponderance of the evidence that his or her detention is unlawful. *See Maldonado v. Olson*, No. 25-CV-3142 (SRN/SGE), 2025 WL 2374411, at *4 (D. Minn. Aug. 15, 2025) (collecting cases).

Uulu asserts three claims that his detention is in violation of the laws of the United States. The Court will consider those claims in turn.

## B. Detention Under the Wrong Statute

Count I of Uulu's Petition, entitled "Violation of the Immigration and Nationality Act [–] Detention Under the Wrong Statute," alleges that Uulu is detained under 8 U.S.C. § 1226(a) rather than 8 U.S.C. § 1225(b)(2). Filing 1 at 12–13 (¶¶ 40–41). Thus, he alleges that because he is not subject to mandatory detention under § 1225, he should be returned to his status prior to detention. Filing 1 at 13 (¶ 41). The Court begins its analysis of this claim with a summary of the parties' arguments.

### 1. The Parties' Arguments

Uulu argues that § 1225(b)(2), which provides for mandatory detention, applies to "applicants for admission," such as aliens who entered the United States without inspection. Filing 1 at 6 (¶¶ 17, 19). He argues that, in contrast, § 1226(a) applies to parolees such as himself whose parole has expired or been terminated. Filing 1 at 6 (¶ 18). He argues that parolees occupy a fundamentally different statutory posture from aliens who enter without inspection and may be detained under either § 1225(b)(2) or § 1226(a) at DHS's discretion. Filing 1 at 6 (¶ 19). Specifically, he argues that the difference is that parolees were inspected at a port of entry, affirmatively paroled by the government, and authorized to reside in the United States. Filing 1 at 6 (¶ 19). He argues that once a parolee's parole expires and the individual is placed in removal proceedings, the individual is detained under the general removal proceedings detention authority of § 1226(a)—not under the arriving-alien mandatory detention provision of § 1225(b)(2). Filing 1 at 6 (¶ 18) (citing 62 Fed. Reg. 10312, 10324 (Mar. 6, 1997)). He argues that he is no longer an "applicant for admission" because he was paroled into the United States by the government, authorized to reside in the community, and placed in full removal proceedings on the non-detained docket. Filing 1 at 12 (¶ 40). He argues further that his is now detained under § 1226(a) because that statute governs detention of noncitizens "pending a decision on whether the [noncitizen] is to be removed from the United States." Filing 1 at 13 (¶ 41) (quoting 8 U.S.C. § 1226(a) with alteration by Uulu).

Federal Respondents argue that an alien who is present in the country but not admitted is deemed an "applicant for admission" and subject to mandatory detention pending removal under § 1225(b). Filing 7 at 1. Federal Respondents argue that Uulu's prior (and now expired and terminated) parole does not change the broad sweep given to § 1225 by the Eighth Circuit in *Avila v. Bondi*, 170 F.4th 1128 (8th Cir. 2026). Filing 1 at 1. Federal Respondents point out that Uulu's

11

charge of removability terminated his parole status. Filing 7 at 2 (citing 8 C.F.R. § 212.5(e)(2)(i)). Federal Respondents argue that at that point Uulu was restored to the status that he had at the time he was paroled. Filing 7 at 2 (citing 8 C.F.R. § 212.5(a)). Thus, Federal Respondents argue that the "analysis is simple here":

> Petitioner is an "applicant for admission", which the statute defines as "[a]n alien present in the United States who has not been admitted or who arrives in the United States." 8 U.S.C. § 1225(a)(1). Because Petitioner is unlawfully present in the United States and has not demonstrated to an examining immigration officer that Petitioner is "clearly and beyond a doubt entitled to be admitted," Petitioner's detention pending removal is mandatory. 8 U.S.C. § 1225(b)(2)(A).

Filing 7 at 6. Federal Respondents disagree with decisions from this district that treated an alien's prior release on recognizance as conditional parole that prevented the application of § 1225, asserting that conclusion is contrary to *Avila*'s broad application of § 1225. Filing 7 at 6–7. Federal Respondents point out that "parole" is not admission. Filing 7 at 7 (citing 8 U.S.C. § 1101(a)(13)(B)). Thus, Federal Respondents argue that even a paroled alien is still an "applicant for admission" under § 1225 because the alien is "present in the United States" and "has not been admitted." Filing 7 at 7 (quoting 8 U.S.C. § 1225(a)(1)). Federal Respondents point to another decision from this district pointing out that both parolees and those who enter without inspection fall within the definition of "applicants for admission" because they have "not been admitted." Filing 7 at 8.

In reply, Uulu argues that neither *Avila* nor *Buenrostro-Mendez* addressed parolees. Filing 10 at 1. He again cites cases from this district holding that aliens that have been released after being inspected at the border are not subject to mandatory detention under § 1225(b)(2)(a) and are entitled to release on a writ of habeas corpus. Filing 10 at 4. Uulu reiterates that § 1226(a) applies to parolees whose parole has expired or been terminated. Filing 10 at 4 (again citing 62 Fed. Reg. 10312, 10324 (Mar. 6, 1997)).

    2.   *Uulu Was Not and Is Not Detained Under § 1226(a)*

        a.   Uulu Remained an "Applicant for Admission" Under § 1225(a) Despite His Parole

The Court rejects Uulu's contention that he is no longer an "applicant for admission" within the meaning of § 1225(a) and not subject to mandatory detention under § 1225(b)(2) because he was paroled into the United States by the government. Filing 1 at 12 (¶ 40). That contention finds no support in the language of the statutes at issue as construed by the Eighth Circuit in *Avila*.

In *Avila*, the Eighth Circuit explained,

In defining [applicant for admission], § 1225(a)(1) reads as follows:

> An alien present in the United States who has not been admitted or who arrives in the United States ... shall be deemed for purposes of this chapter an applicant for admission.

*Avila*, 170 F.4th at 1133 (quoting § 1225(a)(1)). Uulu arrived in the United States at a port of entry and was not admitted, so he plainly fell within the definition of an "applicant for admission." His parole as "DT" at the time of entry means that he was paroled to enter temporarily on humanitarian or public benefit grounds, pursuant to § 1182(d)(5)(A). *See* Filing 1 at 8 (¶ 26) (explaining the meaning of "DT" admission); Filing 9 at 3 (¶ 12) (same). However, such parole does not change his "applicant for admission" status; indeed, Uulu concedes that "[p]arole under INA § 212(d)(5)(A) [8 U.S.C. § 1182(d)(5)(A)] is not an 'admission.'" Filing 1 at 6 (¶ 18) (citing 8 U.S.C. § 1101(a)(13)(B)).[3]

---

[3] Section 1101(a)(13) states in pertinent part,

> (13)(A) The terms "admission" and "admitted" mean, with respect to an alien, the lawful entry of the alien into the United States after inspection and authorization by an immigration officer.

> (B) An alien who is paroled under section 1182(d)(5) of this title or permitted to land temporarily as an alien crewman shall not be considered to have been admitted.

8 U.S.C. § 1101(a)(13)(A)–(B).

"[Section] 1225(b)(2)(A) authorizes detention without bond for 'an alien who is an applicant for admission, if . . . an alien seeking admission is not clearly and beyond a doubt entitled to be admitted.'" *Avila*, 170 F.4th at 1132 (quoting § 1225(b)(2)). The Eighth Circuit explained,

> There is a narrow, discretionary exception to mandatory detention under § 1225(b)(2)(A) in 8 U.S.C. § 1182(d)(5)(A). "But DHS may only use this authority 'on a case-by-case basis for urgent humanitarian reasons or significant public benefit.'" *Buenrostro-Mendez v. Bondi*, 166 F.4th 494, 499 n.3 (5th Cir. 2026) (citation omitted).

*Avila*, 170 F.4th at 1133 n.2. Uulu's parole under § 1182(d)(5)(A) was thus a discretionary exception to mandatory detention, but it did not mean that Uulu was no longer an "applicant for admission" or no longer otherwise subject to § 1225(b).

Uulu's parole status also terminated or expired. By its terms, Uulu's parole status expired on September 11, 2023. Filing 1-1 (I-94). However, prior to that date, Uulu's parole status had already terminated. On October 22, 2022, shortly after Uulu's entry and parole, DHS charged Uulu with removability under 8 U.S.C. § 1182(a)(7)(A)(i)(I) as an immigrant not in possession of a valid entry document. Filing 1 at 9 (¶ 28); Filing 1-5 at 1 (Notice to Appear). An applicable regulation provides that the parole of an alien under § 1182(d)(5)(A) terminates "[w]hen a charging document is served on the alien," and "he or she shall be restored to the status that he or she had at the time of parole." 8 C.F.R. § 212.5(e)(2)(i). Thus, at the time that Uulu was charged as a removable alien, Uulu's status as an applicant for admission under § 1225(b) was "restored." *Id.* His continued release after that point was apparently pursuant to the same regulation, which states further, "If the exclusion, deportation, or removal order cannot be executed within a reasonable time, the alien shall again be released on parole unless . . . the public interest requires that the alien be continued in custody." 8 C.F.R. § 212.5(e)(2)(i). Again, that continued parole did not change Uulu's status from an "applicant for admission" under § 1225(b)(2), it simply made him a non-detained

14

"applicant for admission" under a discrete exception in § 1182(d)(5)(A) and § 212.5(e)(2)(i) to mandatory detention under § 1225(b).

More importantly, the statutory exception in § 1182(d)(5)(A) to mandatory detention under § 1225(b) makes clear that it does not change an alien's status or provide the alien with treatment that is different from any other "applicant for admission." Specifically, the statute states in pertinent part,

> [W]hen the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.

8 U.S.C. § 1182(d)(5)(A). This provision provides that upon termination of parole the alien "shall forthwith return or be returned to the custody from which he was paroled," *id.*, which plainly means mandatory detention pursuant to § 1225(b), not a different detention scheme under § 1226. Not only is the alien returned to mandatory detention pursuant to § 1225(b), but the alien's "case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States." *Id.* This language plainly means that the formerly paroled alien is treated like any other "application for admission" defined by § 1225(a) and the formerly paroled alien's case is treated in the same way as the case of any other alien under § 1225(b) who was not afforded discretionary parole under § 1182(d)(5)(A).

In short, contrary to Uulu's contentions, parolees do not occupy a fundamentally different statutory posture from aliens who enter without inspection, because like other aliens, a parolee remains an "applicant for admission" subject to detention under § 1225(b) notwithstanding prior parole status.

15

   b.  Uulu Was Not Detained Under § 1226(a) After His Parole
       Expired

The Court also rejects Uulu's contention that after his parole expired and he was placed in

removal proceedings, he was detained under what he calls the "general removal detention authority

of § 1226(a)," not under the "arriving-alien mandatory detention authority of § 1225(b)(2)." Filing

1 at 6 (¶ 18). There is simply no convincing authority for that contention.

Uulu cites in support of this contention 62 Fed. Reg. 10312, 10324 (Mar. 6, 1997). Filing

1 at 6 (¶ 18). The Federal Register article Uulu cites concerns an interim rule on inspection and

expedited removal of aliens; detention and removal of aliens; conduct of removal proceedings; and

asylum procedures. 62 Fed. Reg. 10312 (Mar. 6, 1997). However, it says nothing whatever at the

cited page about detention authority under § 1225 or § 1226. Instead, it discusses "Voluntary

Departure and Employment Authorization." 62 Fed. Reg. at 10324. A more pertinent part of the

article is contrary to Uulu's contention:

> One commenter objected to the inclusion of parolee in the definition of arriving
> alien. The definition in the proposed rule states "An arriving alien remains such
> even if paroled pursuant to section 212(d)(5) of the Act." The inclusion of paroled
> aliens was based on the statutory language in section 212(d)(5) of the Act, which
> states "* * * but such parole of such alien shall not be regarded as an admission of
> the alien and when the purposes of such parole shall, in the opinion of the Attorney
> General, have been served the alien shall forthwith return or be returned to the
> custody from which he or she was paroled and thereafter his case shall continue to
> be dealt with in the same manner as that of any other applicant for admission to the
> United States." Existing regulations at §212.5(d) relating to termination of parole
> echo this provision, stating "* * * he or she shall be restored to the status he or she
> had at the time of parole." The Department feels there is solid statutory basis for
> inclusion of certain paroled aliens in the definition of arriving alien, and so will
> retain this provision.

62 Fed. Reg. at 10313. This statement makes clear that parole under § 1182(d)(5) does not make

the paroled alien any different from any other "arriving alien."

Uulu also relies on district court decisions finding that once an alien is paroled, the alien's

detention and removal are subject to § 1226 not § 1225. One such decision from this district states

16

that the government should have detained an alien for removal proceedings when he arrived. *Silva v. Warden, Lincoln Cnty. Detention Ctr.*, No. 8:26-cv-131, 2026 WL 926725, \*1 (D. Neb. April 6, 2026). The court found that the government instead "decided to release him on conditional parole—and when it did so, the petitioner's detention and removal were subject to the statutory scheme in § 1226." *Id.* (citing cases).[4] However, this conclusion without any analysis or interpretation of applicable statutes is unpersuasive.

The cases on which the *Silva* decision relied are equally unsatisfying. In *Faizyan v. Casey*, No. 3:25-cv-02884-RBM-JLB, 2025 WL 3208844 (S.D. Cal. Nov. 17, 2025), the court concluded that § 1226 rather than § 1225 applied. That court concluded first that "Respondents' own exhibits established that Petitioner was detained pursuant to Respondents' discretionary authority under § 1226." *Faizyan*, 2026 WL 3208844, at \*5 (citing a Form I-200 Warrant stating that it was issued pursuant to § 1226). Second, the court concluded that "the statutory text—and its interpretation by the great weight of district courts to have considered it—establishes that Petitioner was detained under § 1226." *Id*. The first ground is inapposite in Uulu's case, because there is no warrant for his arrest citing any statute in the record. The second ground is untenable in this Circuit. The statutory interpretation on which the *Faizyan* court relied read § 1225(b)(2)(A) as treating "applicant for admission" and "seeking admission" as separate elements. *Id*. That reading of the statutes was soundly rejected by the Eighth Circuit in *Avila*. 170 F.4th at 1133–35 (concluding that

---

[4] Uulu cites other decisions by the same judge as additional support, but they are merely "make weight" citations with no additional persuasive authority. The decision in *Vargas Ponce v. Mullin*, No. 8:26-CV-163, 2026 WL 1050648, at \*1 (D. Neb. April 17, 2026), simply conditionally grants the alien's petition for the reasons stated in *Silva*, with no additional analysis. The decision in *Gvritishvili v. Mullin*, No. 4:26-CV-3123, 2026 WL 1362439, \*1 (D. Neb. May 15, 2026), simply notes that it had "conditionally granted [the alien's] petition for writ of habeas corpus, ordering the government to provide the petitioner with a bond hearing pursuant to 8 U.S.C. § 1226 and the corresponding regulations." Another decision from this district by a different judge, also cited by Uulu, does not turn on the applicability of § 1225 or § 1226. *See Sandhu v. Mullin*, No. 7:26CV5009, 2026 WL 1146643 (D. Neb. April 28, 2026).

17

the two phrases were "equivalent," so that "seeking admission" was not a separate element under § 1225(b)(2)).

Again, pursuant to the plain language of § 1182(d)(5)(A), parole does not change an alien's status and ultimately places an alien back under § 1225(b) not under § 1226. As explained in the preceding subsection, the plain language of § 1182(d)(5)(A) concerning termination of parole when its purposes have been served means that the formerly paroled alien is placed back in his or her prior status, which in turn means that the formerly paroled alien is subject to mandatory detention under § 1225(b) and treated like any other "application for admission" defined by § 1225(a). In short, the formerly paroled alien's case is treated in the same way as the case of any other alien under § 1225(b) who was not afforded discretionary parole under § 1182(d)(5)(A).

Thus, Uulu falls squarely within the scope of § 1225(b) and remained within its scope—that is, subject to detention without a bond hearing—because he is and remains an "applicant for admission" within the definition of § 1225(a). *See also Jennings v. Rodriguez*, 583 U.S. 281, 297 (2018) (explaining that "neither § 1225(b)(1) nor § 1225(b)(2) says anything whatsoever about bond hearings"). Thus, Uulu has failed to carry his burden to show that he is entitled to any relief on his first claim for habeas corpus relief. *See Maldonado*, 2025 WL 2374411, at *4 (concluding that a petitioner under § 2241 bears the burden of demonstrating by a preponderance of the evidence that his or her detention is unlawful (collecting cases)).

### C. Detention in Violation of the Fifth Amendment

Count II of Uulu's Petition is entitled "Violation of the Fifth Amendment Due Process Clause [–] Detention After Prolonged Community Release Without Process." Filing 1 at 13. In this Count, Uulu alleges that respondents are violating his due process rights by detaining him with (a) "no written notice of the reasons for detention"; (b) "no hearing before a neutral decisionmaker"; (c) "no individualized assessment of flight risk or danger"; and (d) "no finding of

18

changed circumstances justifying detention after years of community release." Filing 1 at 14 (¶ 47). Once again, the Court begins its analysis of this claim with a summary of the parties' arguments.

### 1. The Parties' Arguments

Uulu argues that the Due Process Clause of the Fifth Amendment provides an independent constitutional floor, even where a statute authorizes mandatory detention. Filing 1 at 7 (¶ 20). He argues that the three-factor balancing test from *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976), should be used to evaluate the sufficiency of procedural due process. Filing 1 at 7 (¶ 21). He argues that the *Mathews* test demonstrates the due process violation in his case. Filing 1 at 14–15 (¶¶ 48–52). Under that test, he argues that his liberty interest is at its highest while being wrongfully detained; that the risk of erroneous deprivation is extreme when he was given no process prior to denial of liberty; and that the government's interest does not justify detention without process because the administrative burden is minimal. Filing 1 at 14–15 (¶¶ 49–51).

In addition, or in the alternative, Uulu argues that the Court should use the approach in *Sandhu v. Mullin*, No. 7:26-CV-5009, 2026 WL 1146643 (D. Neb. Apr. 28, 2026), to determine that his detention was not accompanied by constitutionally sufficient procedures. Filing 1 at 15–18 (¶¶ 53–65). Applying that approach, he argues that the due process protections to which he was entitled were determined by his initial grant of release. Filing 1 at 17 (¶ 58). He then likens his conditional release to parole from criminal incarceration, which he contends demonstrates a liberty interest. Filing 1 at 17 (¶ 60). He argues that constitutionally sufficient due process when the government seeks to revoke a previous release requires at a minimum specific notice of the allegations of the terms of parole that were violated and a meaningful opportunity to respond. Filing 1 at 18 (¶ 62). Here, he contends that there is no evidence that his longstanding freedom in

19

the community was properly revoked, so he must be released and put in the same position he enjoyed before his re-detention. Filing 1 at 18 (¶ 64).

In response, Federal Respondents argue that Uulu's temporary detention does not offend due process. Filing 7 at 8. Federal Respondents argue that Congress made a legislative judgment that undocumented aliens should be detained during removal proceedings, which is the prerogative of the legislative branch. Filing 7 at 9. Indeed, Federal Respondents argue that in *Demore v. Kim*, 538 U.S. 510 (2003), the Supreme Court determined that Congress was justified in detaining aliens subject to mandatory detention during the entire course of their removal proceedings. Filing 7 at 9. Federal Respondents argue further that in *Banyee v. Garland*, 115 F.4th 928 (8th Cir. 2024), the Eighth Circuit concluded that detention was constitutionally permissible when deportation was still on the table. Filing 7 at 10. Federal Respondents argue that *Banyee* leaves no room for additional constitutional protections for aliens who experience prior permission to be in the United States, where that case in fact involved prior lawful permanent residents. Filing 7 at 11.

In reply, Uulu argues that he is making a due process challenge to his detention, not a challenge to any statute under which he is purportedly detained. Filing 10 at 5. He argues that he was paroled at the time he entered to the United States, but then he was detained without any due process on November 4, 2025. Filing 10 at 5. He contends that due process applies to everyone in the United States, even noncitizens in pending removal proceedings. Filing 10 at 6. He then reiterates his analysis of the *Mathews* factors and the *Sandhu* approach. Filing 10 at 6–9.

### 2.  *Uulu's Detention Does Not Violate Due Process*

The Court does not find it necessary or appropriate to consider Uulu's Due Process claim in light of either the *Mathews* three-factor test or the *Sandhu* approach. For the reasons set out in the Court's decisions in *Alberto Rodriguez v. Jeffreys*, No. 8:25CV714, 2025 WL 3754411, at

*15–17 (D. Neb. Dec. 29, 2025), the Court denies Uulu's claim of violation of his Fifth Amendment due process rights in Count Two of his Petition.

As this Court observed in *Alberto Rodriguez*, in *Banyee v. Garland*, 115 F.4th 928 (8th Cir. 2024), the Eighth Circuit explained that "[t]he rule has been clear for decades: '[d]etention during deportation proceedings [i]s . . . constitutionally valid.'" *Banyee*, 115 F.4th at 931 (quoting *Demore v. Kim*, 538 U.S. 510, 523 (2003)). In both *Banyee* and *Demore*, the statute at issue was 8 U.S.C. § 1226(c), which—like § 1225(b) at issue in Uulu's case—requires mandatory detention. *Id.* (citing *Demore*, 538 U.S. at 514). The Eighth Circuit explained,

> [In *Demore*, the Supreme Court] reaffirmed its "longstanding view that the [g]overnment may constitutionally detain deportable aliens during the limited period necessary for their removal proceedings." *Demore*, 538 U.S. at 526, 123 S.Ct. 1708. The reason, according to the Court, was that "Congress may make rules as to aliens that would be unacceptable if applied to citizens." *Id*. at 522, 123 S.Ct. 1708; *accord Mathews v. Diaz*, 426 U.S. 67, 79–80, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976). In other words, the government has more flexibility when dealing with immigration. *See, e.g., United States v. Quintana*, 623 F.3d 1237, 1242 (8th Cir. 2010) (explaining that the "constitutional[ ] valid[ity]" of detention pending deportation means that the usual limits on *Terry* stops "do[ ] not apply to ... administrative arrest[s] based upon probable cause that an alien is deportable"); *see also Wong Wing v. United States*, 163 U.S. 228, 235, 16 S.Ct. 977, 41 L.Ed. 140 (1896) (explaining that the power to deport "would be vain if those accused could not be held in custody pending [an] inquiry into their true character and while arrangements were being made for their deportation").

*Banyee*, 115 F.4th at 931. The Eighth Circuit explained further,

> It is true, as Banyee emphasizes, that the Court has described detention pending deportation as "brief," "limited," and "short[ ]." *Demore*, 538 U.S. at 513, 523, 526, 528–29, 531, 123 S.Ct. 1708. But nothing suggests that length determines legality. To the contrary, what matters is that detention pending deportation "ha[s] a definite termination point"—deporting or releasing the alien—making it "materially different" from the "potentially permanent" confinement authorized by other statutes. *Id*. at 528–29, 123 S.Ct. 1708 (citation omitted); *see Zadvydas v. Davis*, 533 U.S. 678, 697, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001) (drawing the same definite-versus-indefinite distinction); *cf. Borrero v. Aljets*, 325 F.3d 1003, 1008 (8th Cir. 2003) (holding that even indefinite detention can be constitutional for "alien[s] who [are] stopped at the border"). The *why*, in other words, is more important than *how long*. *See Zadvydas*, 533 U.S. at 693–94, 121 S.Ct. 2491 (noting

21

that "the nature of th[e] protection" to which aliens are entitled "var[ies] depending upon *status and circumstance*" (emphasis added)).

*Banyee*, 115 F.4th at 932 (emphasis in the original).

The Eighth Circuit then stated,

These cases leave no room for a multi-factor "reasonableness" test. It is true, as Banyee has pointed out, that deciding what process is due ordinarily requires a form of interest balancing. *See Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). But *Zadvydas* and *Demore* have already done whatever balancing is necessary. *See, e.g., Zadvydas*, 533 U.S. at 682, 701, 121 S.Ct. 2491 (linking a "'reasonable time' limitation" to "the likelihood of removal in the reasonably foreseeable future"); *Demore*, 538 U.S. at 528, 123 S.Ct. 1708 (explaining that, "when the Government deals with deportable aliens, the Due Process Clause does not require it to employ the least burdensome means," so it is sufficient if "detention necessarily serves the purpose of preventing deportable aliens from fleeing prior to or during their removal proceedings"). Indeed, the lead dissent in *Demore* advocated for the type of "individual determination" Banyee now seeks, presumably under a *Mathews*-type inquiry. 538 U.S. at 549–58, 561 n.16, 123 S.Ct. 1708 (Souter, J., concurring in part and dissenting in part); *cf. Flores*, 507 U.S. at 314 n.9, 113 S.Ct. 1439 (rejecting *another* dissent's call for "fully individualized custody determinations"). The majority opted for a bright-line rule instead: the government can detain an alien for as long as deportation proceedings are still "*pending.*" *Demore*, 538 U.S. at 527, 123 S.Ct. 1708 (majority opinion).

*Banyee*, 115 F.4th at 933 (emphasis in the original).

For Uulu, like the petitioner in *Banyee*, the deportation proceedings are still pending. *Id*. Again, Uulu's detention is pursuant to § 1225(b), which does not authorize a bond hearing. *See Jennings*, 583 U.S. at 297 (explaining that "neither § 1225(b)(1) nor § 1225(b)(2) says anything whatsoever about bond hearings"). Uulu contends only that he is being held without an individualized detention hearing, but § 1225(b) requires his detention. "Congress may make rules as to aliens that would be unacceptable if applied to citizens," and "the government has more flexibility when dealing with immigration." *Banyee*, 115 F.4th at 931 (internal quotation marks and citations omitted). Thus, the Court rejects Uulu's attempt to liken his parole status to parole from criminal incarceration and invoke similar due process requirements. Filing 1 at 17 (¶ 60).

22

There would seem to the Court to be a much greater similarity between an alien paroled on entry then later detained and an alien granted permanent resident status then detained for deportation, like the petitioner in *Banyee*. *See Banyee*, 115 F.4th at 930. However, the alien's permanent resident status in *Banyee* did not entitle him to application of a due process balancing test, and this Court finds neither does Uulu's re-detention after parole. *Id.* at 931–33,

Furthermore, the Supreme Court has already performed the due process balancing test for immigration cases and found that detention is reasonable in the context of determination of whether an alien should be removed. *Banyee*, 115 F.4th at 933 ("These cases leave no room for a multi-factor 'reasonableness' test. It is true, as Banyee has pointed out, that deciding what process is due ordinarily requires a form of interest balancing. But *Zadvydas* and *Demore* have already done whatever balancing is necessary." (internal quotation marks and citations omitted)). Thus, Uulu's due process rights have not been violated because there is "a bright-line rule" applicable in his circumstances: "the government can detain an alien for as long as deportation proceedings are still '*pending*.'" *Id.* (quoting *Demore*, 538 U.S. at 527 (majority opinion), with emphasis in the original).

Thus, Uulu has failed to carry his burden to show that he is entitled to any relief on his due process claim in Count II of his Petition. *See Maldonado*, 2025 WL 2374411, at \*4 (concluding that a petitioner under § 2241 bears the burden of demonstrating by a preponderance of the evidence that his or her detention is unlawful (collecting cases)).

### D.  Indefinite Detention

In Count III of his Petition, Uulu asserts a claim entitled "Violation of the Fifth Amendment Due Process Clause [–] Indefinite Detention Without Reasonably Foreseeable Removal." Filing 1 at 19. The Court turns first to a summary of the parties' arguments.

### 1. The Parties' Arguments

In support of his last claim, Uulu argues that the Supreme Court held in *Zadvydas* that civil immigration detention becomes unconstitutional when "removal is not reasonably foreseeable." Filing 1 at 19 (¶ 67) (quoting *Zadvydas*, 533 U.S. at 699). He contends that this principle applies with equal force to inadmissible aliens. Filing 1 at 19 (¶ 67) (citing *Clark v. Martinez*, 543 U.S. 371, 378–82 (1976)). He contends that there is no reasonably foreseeable end to his detention because he cannot be removed to Russia under the IJ's orders and his removal to Kyrgyzstan is contingent on Kyrgyzstan's willingness to accept a non-citizen, after he renounced his Kyrgyz citizenship in 2007. Filing 1 at 19 (¶ 68). He argues that there is no evidence that Kyrgyzstan has agreed to accept him or even that the discretionary citizenship restoration process has been initiated. Filing 1 at 19 (¶ 68). Thus, he alleges that he faces continued detention in excess of the presumptively constitutional 180-day period with no reasonably foreseeable removal in the future. Filing 1 at 19 (¶ 69).

Federal Respondents' response is concise. They argue that this claim is foreclosed by *Banyee v. Garland*, 115 F.4th 928, 933 (8th Cir. 2024), because the removal proceedings are ongoing as Uulu pursues his appeal with the BIA. Filing 7 at 11 (citing 8 C.F.R. § 1003.39). Federal Respondents argue that Uulu's claim challenging indefinite detention is not yet ripe where the presumptively constitutional period for the government to remove him pursuant to a final administrative order of removal has not yet begun to run. Filing 7 at 11.

In reply, Uulu argues that this claim is not premature, because detention is being imposed now, and the reality that removal is not executable now—because his administrative appeal has been pending for over a year—weakens the government's justification for continued detention. Filing 10 at 9. He also argues that his claim is not foreclosed by *Banyee* because the constitutional injury of re-detaining an alien after a period of authorized release is different from a challenge to

24

mandatory detention imposed during removal proceedings. Filing 10 at 10. He also contends that *Banyee* involved an alien convicted of criminal offenses, but he has not been convicted of any crime. Filing 10 at 10. Finally, he argues that *Banyee* held that detention during proceedings has a "definite termination point," but that applies to continuous detention during active proceedings, not to a situation where the government waits years after proceedings begin, allows a person to live freely in the community, and then re-detains him without process. Filing 10 at 10.

2.  *Uulu's "Reasonably Foreseeable Removal" Challenge Is Premature*

In *Zydvadas*, the Supreme Court stated, "After entry of a final removal order and during the 90–day removal period, . . . aliens must be held in custody," pursuant to 8 U.S.C. § 1231(a)(2), and "[s]ubsequently, . . . the Government 'may' continue to detain an alien who still remains here or release that alien under supervision," pursuant to 8 U.S.C. § 1231(a)(6). *Zadvydas v. Davis*, 533 U.S. 678, 683 (2001). "[I]nterpreting the statute to avoid a serious constitutional threat, [the Supreme Court] conclude[d] that, once removal is no longer reasonably foreseeable, continued detention is no longer authorized by statute." *Id.* at 699. As to when the "no longer reasonably foreseeable" point has been reached, the Supreme Court held,

> [W]e recognize [a 6-month] period. After this 6–month period, once the alien provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut that showing. And for detention to remain reasonable, as the period of prior postremoval confinement grows, what counts as the "reasonably foreseeable future" conversely would have to shrink. This 6–month presumption, of course, does not mean that every alien not removed must be released after six months. To the contrary, an alien may be held in confinement until it has been determined that there is no significant likelihood of removal in the reasonably foreseeable future.

*Zadvydas*, 533 U.S. at 701. Thus, the "trigger" to start the time running on the presumptively reasonable 6-month period is "a final removal order." *Id.* at 683 (citing § 1231(a)(2)); *see also Banyee*, 115 F.4th at 933 ("The majority [in *Denmore*] opted for a bright-line rule instead: the

25

government can detain an alien for as long as deportation proceedings are still '*pending*.'" (quoting *Demore*, 538 U.S. at 527 (majority opinion)).

Here, Uulu is not subject to a final removal order, because he appealed the IJ's decision denying his asylum request and ordering him removed to Kyrgyzstan. Filing 1 at 11 (¶ 34); Filing 9 at 4 (¶ 18). That appeal is still pending. Thus, his claim of indefinite detention based on no reasonably foreseeable removal is premature, because the time for his presumptively constitutional detention pending removal has not begun to run. The Court rejects Uulu's attempt to invoke the authority of *Zadvydas* for the determination of the constitutionality of his detention while he simultaneously ignores the "final removal order" requirement for such a claim. Filing 10 at 10. The Court likewise rejects Uulu's attempt to rely on some constitutional injury that is supposedly different from the one at issue in *Zadvydas* as a transparent attempt to repackage his Fifth Amendment due process claim in Count II as a *Zadvydas* claim in Count III. Filing 10 at 10. Uulu's detention now—like the detention of the petitioner in *Zadvydas*—is in the context of removal proceedings, albeit in Uulu's case, detention prior to a final order of removal and in *Zadvydas* in the context of detention after a final order of removal. It is precisely that difference that is fatal to Uulu's claim under *Zadvydas*.

Thus, Uulu has failed to carry his burden to show that he is entitled to any relief on his *Zadvydas* claim that his removal is "not reasonably foreseeable" in Count III of his Petition. *See Maldonado*, 2025 WL 2374411, at *4 (concluding that a petitioner under § 2241 bears the burden of demonstrating by a preponderance of the evidence that his or her detention is unlawful (collecting cases)).

### III. CONCLUSION

Upon the foregoing,

IT IS ORDERED that Petitioner Emil Mamatkasym Uulu's Petition for Writ of Habeas

Corpus Pursuant to 28 U.S.C. § 2241, Filing 1, is denied in its entirety.


Dated this 26th day of May, 2026.

BY THE COURT:

_____
Brian C. Buescher
United States District Judge

27